**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **TAMMY S PALMER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **No. 5:15-CV-132-CAR-CHW** |
| | : | |
| **CAROLYN W. COLVIN,** | : | **Social Security Appeal** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## REPORT AND RECOMMENDATION

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff Tammy S. Palmer's application for benefits. 42 U.S.C. Section 405(g). Because substantial evidence does not support the Commissioner's decision, it is **RECOMMENDED** that this case be **REMANDED** pursuant to "sentence four."

## BACKGROUND

Plaintiff Tammy Palmer filed an application for Disability benefits on April 13, 2011, (R. 180), alleging major depression disorder, kidney stone, heart murmur, psychotic features, personality disorder, enlarged heart, lower back pain, diabetes, high blood pressure, and high cholesterol. It was determined that she suffered from affective disorder, hypertension, and left nephrectomy, but her claim was denied initially and on reconsideration. (R. 100). A Hearing was held in front of Todd Spangler, an administrative law judge (ALJ), on May 15, 2013. (R. 60). The ALJ issued a decision denying Plaintiff's appeal on July 18, 2013, (R. 55), which the Administrative Appeal Council declined to review on February 11, 2015. (R. 1). Plaintiff now appeals to this Court.

**STANDARD OF REVIEW**

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, that decision must be affirmed even if the evidence preponderates against it.

**EVALUATION OF DISABILITY**

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience."

*Winschel*, 631 F.3d at 1178 (11th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## THE MEDICAL RECORD

The medical and opinion record in this case consists of the following. Plaintiff's initial evaluation and reconsideration (R. 105 – 115, 121), the Administrative Hearing in front of the ALJ (R. 60 - 90), a Physical Residual Functional Capacity Assessment (R. 475 – 482), a Psychological Evaluation (R. 559 – 564), a Case Analysis (R. 565 – 578), a Mental Residual Functional Capacity Assessment (R. 580 – 583), various disability reports, function reports, and questionnaires (R. 198 – 219, 223 – 230, 234 – 241, 245 – 261, 263 – 270, 276 - 296), as well as medical records from the Medical Center of Central Georgia (R. 11 – 37, 316 – 328, 343 – 358, 372 – 458, 466 – 468, 585 - 631), First Choice Primary Care (R. 333 – 340, 674 – 696), Urology Specialists of Georgia (R. 363 – 367, 461 – 462, 472-474), and River Edge Behavioral Health Center (R. 484 – 558, 633 – 673, 696 - 719).

Plaintiff alleges that she has not worked since 2004. The medical record in this case begins on March 16, 2011, when Plaintiff was admitted to the Medical Center of Central Georgia following acute pain related to nephrological morbidity. (R. 317). Plaintiff had a pre-existing history of hypertension, Type 2 Diabetes, and Kidney Stones. *Id.* Her initial examination indicated she was suffering from left-sided nephrolithiasis with obstructive uropathy, urinary tract infection, hypertension, diabetes, a nodule on her lung, and hyperbilirubinemia resulting from recurrent kidney stones. (R. 318). A CT was ordered and showed a "massive hydronephrosis with hydroureter with multiple stones scattered throughout the left ureter as well as a stone at the left UVJ." (R. 321). Plaintiff's urinary tract was blocked by kidney stones and could not properly drain or process waste. She underwent a cystoscopy left retrograde pyelogram

with stent placement. (R. 325). The surgery was successful, but the kidney stones were not removed. (R. 328). Plaintiff followed up two weeks later and was suffering from back pain, hypertension, diabetes, and depression with anxiety. (R. 330). At the time Plaintiff was taking the following medications: fluoxetine, amlodipine, tramadol, Seroquel, novolin, hydrocholorothiazide-lisinopril, metformin, Ibuprofen, cyclobenzaprine, Lortab, Oxybutynin, and Bactrim. (R. 335). In May, it was determined that Plaintiff needed to undergo Kidney stone extraction. (R. 366). The procedure was performed on June 8, 2011.  (R. 343).

On June 27th, 2011, Plaintiff was hospitalized with a "nearly fatal series of illnesses and medical complications," including urosepsis, hydronephrosis, urinary tract obstruction, failure of stent placement, left nephrectomy, cirrhosis, ascites, and hepatitis C, and IV drug use. (R. 388). After presenting at the hospital with severe pain, a CT scan showed fluid and air buildup in Plaintiff's renal pelvis. Emergency surgery was performed and a stent was able to be placed. Plaintiff was then admitted to the ICU and began to recover. Samples from Plaintiff's kidneys showed moderate infection, but her condition improved. A CT scan showed that her kidney was draining properly, and she was transferred to "the floor." (R. 461). Less than a week later, however, Plaintiff presented with respiratory distress and was taken back to the ICU, where she underwent a tracheotomy, needed the assistance of a ventilator to breathe, and required a feeding tube. An MRI scan showed an abscess on her kidney, and the kidney was removed on July 8th, 2011. (R. 394). On July, 15, 2011, Plaintiff underwent a bronchoscopy which revealed a collapsed airway "typical of COPD and obstructive lung function." (R. 404). Imaging of Plaintiff's liver revealed that it was enlarged. (R. 443).  Plaintiff was eventually released on August 6th, 2011, and returned to the homeless shelter where her and her husband stayed. (R. 461).

Following Plaintiff's six-week hospital stay, she followed up at the Medical Center of Central Georgia multiple times. (R. 461- 462, 466 - 467). Her symptoms improved and her feeding tube was removed in September. (R. 466). In November, however, Plaintiff continued to have renal calculus and swelling on the left side. (R. 472). Over the next year Plaintiff went to the Emergency Room on several occasions. In September 2012, Plaintiff went to the emergency room complaining of chest pain, cough, weakness, and shortness of breath. (R 594). Plaintiff had several abnormal lab values and was released following a diagnosis of bronchitis. (R. 598). A chest X-ray showed no acute cardiopulmonary abnormalities, and an electrocardiogram showed normal results. (R. 600). Plaintiff was also sporadically treated at Primary Care, a reduced fee clinic. The appointments were for routine follow ups, and Plaintiff reported headaches, depression, fatigue, and weakness. (R. 677, 679, 683, 685). Every note from First Care Primary Care documents some sort of limitation of Plaintiff's treatment due to financial concerns. (R. 677, 679, 683, 685). In August 2012, Plaintiff was referred to Dr. Nelson for diabetic retinopathy following an eye exam. (R. 677). These records also reflect continued difficulty in treating Plaintiff's depression and diabetes. (R. 680).

The following medical records were submitted to the Appeals Council and related to treatment Plaintiff received after the ALJ's decision. In 2014, Plaintiff was again admitted to the hospital with high blood sugar. (R. 11). She was suffering from chest pain and headaches. Various tests were performed and Plaintiff's cardiac labs and EKG were normal, except for suspected left ventricular hypertrophy. (R. 16, 32). Plaintiff was diagnosed with dehydration, diabetic ketoacidosis, diabetes mellitus, electrolyte imbalance, weakness, and UTI. (R. 12). She was discharged the same day. (R. 16).

### a. *Plaintiff's Mental Impairments*

In addition to the above mentioned medical conditions, the records shows that Plaintiff was routinely treated for mental health issues at River Edge Behavioral Health beginning in March 2011. Plaintiff initially sought treatment for depression after being referred by First Choice Primary Care. She stated that she had previously been prescribed Prozac and Seroquel but they did not help. (R. 488). Plaintiff was alert, cooperative, calm, and coherent, but her mood was depressed. (R. 495). Plaintiff was initially diagnosed with Major Depressive Disorder, cocaine dependence in full remission, and stressors including homelessness. (R. 502). A treatment plan was created for Plaintiff, and the stated goal was for her not to be depressed so that she can return to work. (R. 504). Plaintiff's medication list included Novolin, Ibuprofen, Amlodipine, Tramadol, Cyclobenzarpine, Seroquel, and Prozac. (R. 537).  Plaintiff's treatment plan included medication, group support, and identification of negative behaviors. *Id*. Plaintiff's goals and treatment plan remained the same as she returned to Rive Edge sporadically of the next few months. Plaintiff was sometimes described as being restless and worrisome with a remarkable mental status, while at other times she was described as having an unremarkable mental status. (R. 508, 511, 517, 520, 536). Plaintiff continually reported having no energy and physical problems and was diagnosed with personality disorder NOS in April. Plaintiff went to River Edge Behavioral Health regularly until May, 2011.

Plaintiff returned on August 10, 2011, which corresponds to being released from the hospital. (R 529). From that point forward Plaintiff's treatments at River Edge became less routine. She was treated in December 2011, (R. 533), and reported depression, anxiety, increased blood pressure, stress, and memory problems. (R. 553).  Plaintiff returned again in March 2012 complaining of feeling tired, mood swings, racing thoughts, insomnia, and running out of

medication. (R. 665). Plaintiff was alert, cooperative, and calm but her speech was loud, pressured, and rapid. (R. 665). In June, Plaintiff reported depression, mood swings, racing thoughts, irritability, paranoia, and financial problems. (R. 655). Plaintiff was cooperative and calm but her mood was anxious, depressed, and bland. (R. 656). Medications that Plaintiff reported being unable to afford were discontinued. (R. 656). In September, Plaintiff reported depression and anxiety rated 10/10, but she was not assessed because her blood sugar was 428. Plaintiff was taken to the Emergency Room. (R. 645).  Plaintiff continued to rate her depression severe through March 2013. (R. 637, 705, 715). Throughout Plaintiff's visits to River's Edge, her blood pressure ranged from 181/117 to 125/79. (R. 533, 538, 637, 652, 669, 671, 703, 718). Prior to Plaintiff's stay in the hospital, the Doctors at River's Edge opined that her GAF was 67 (R. 502, 545), leading up to the hospital stay Plaintiff's GAF decreased to 60 (R. 60), and afterwards it ranged between 48[1] and 60. (R. 554, 643, 651, 668, 670, 713). Plaintiff was variously diagnosed with Bipolar Disorder, Personality Disorder NOS, Major Depressive Disorder, and economic stressors. (R. 501, 544, 549, 667).

On January 26, 2012, Plaintiff underwent a comprehensive psychological evaluation performed by John Muller, Ph.D. Plaintiff's I.Q. was determined to be 87. (R. 562). Dr. Muller diagnosed Plaintiff with Dysthymic Disorder and Polysubstance Dependence in Remission. (R. 564). He opined that she has not found a lot of benefit from her treatments at River's Edge, which suggested that she was unlikely to have a change in her depressive situation. (R. 564). Plaintiff's social relationships were considered to be "marked by indifference and withdrawal,"

---

[1] The Commissioner does not "endorse the GAF scale for 'use in the Social Security and SSI program,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorder listings.'" *Wind v. Barnhart*, 133 F. App'x 684, 692, n.5 (11th Cir. 2005) (Citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  Although, if a GAF is fifty (50) or below "the ALJ should determine what weight, if any, to give that particular score." *Sanders v. Astrue*, 974 F. Supp. 2d 1316, 1331 (N.D. Ala 2013) (citing *McCloud v. Barnhart*, 266 F. App'x 410 (11th Cir. 2006).

but she had no history of difficulty interaction. Plaintiff claimed memory loss, but "she performed very adequately in cursory measures of such during" the evaluation. (R. 564).

## DISABILITY EVALUATION IN THIS CASE

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since April 15, 2004. (R. 45). At step two, the ALJ found that Plaintiff suffered from the following severe impairments, "diabetes, status post left nephrectomy, and bipolar disorder." (R. 45). The ALJ determined that Plaintiff's hypertension, enlarged heart, decreased vision, cirrhosis, hepatitis, and low back pain did not constitute severe impairments. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (R. 46). The ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform light work and perform one, two, or three step instructions with only occasional contact with co-workers, supervisors, or the public. (R. 48). At step four, the ALJ determined that Plaintiff could not perform past relevant work as a cashier, sandwich maker, assistant manager, or server. (R. 52). At step five, the ALJ determined that Plaintiff could perform work as a "cleaner, hand packer, and production worker." (R. 53). Thus, the ALJ determined that Plaintiff was not disabled from April 15, 2004, to the date of his decision.  (R. 27).

## ANALYSIS

Plaintiff argues that the ALJ improperly discredited her testimony regarding the functional decline she experienced following medical complications in the summer of 2011. These complications resulted in Plaintiff briefly being unable to breathe or eat without medical assistance. This alleged functional decline is reflected in the significant differences of daily

activity Plaintiff reported in her April 2011 function report versus those reported in November and at the administrative hearing. The ALJ "gave dispositive weight" to Plaintiff's April 2011 report and used it to discredit Plaintiff's subsequent allegations. The ALJ found that the medical record did not provide objective evidence which could produce the decline. Without such evidence, the ALJ determined that the subsequent reports of declined ability were "strategically exaggerated allegations." Plaintiff argues that her month long hospitalization in which she nearly died provides ample evidence to support her alleged decline in functionality, and the ALJ must have ignored this evidence. Plaintiff is correct.

    a.   *Credibility Determination*

Social Security Rule 96-7p governs credibility findings made by ALJs and states that findings of credibility cannot be based on "intangible or intuitive notion about and individual's credibility." Instead, credibility determinations must be based on evidence and articulated sufficiently to make those reviewing the decision aware of the reasons for the determination and the weight given. SSR, 96-7p. When a credibility finding is articulated and supported by substantial evidence, it will not be disturbed by a reviewing court. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (*MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986)).  However, when credibility is "critical to the outcome of the case," a lack of credibility finding becomes a ground for remand. *Id*. (citing *Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir.1982)). Where a Plaintiff's subjective claims are supported by the clinical evidence and the ALJ's reason for rejecting them does not constitute substantial evidence, remand may be appropriate. See *Bloodsworth v. Heckler*, 703 F.2d 1233, 1242-43 (11th Cir. 1983).

i.    *Function Reports*

Plaintiff successfully filled out two function reports in this case.  The first function report, dated April 25, 2011, stated that Plaintiff was capable of doing light house work, bathing, preparing simple meals, doing the dishes and laundry, making her bed, attending church, grocery shopping, crocheting, and walking for only twenty to thirty feet before needing to rest. (R. 234 – 241). Plaintiff's husband also completed a function report of Plaintiff's activities, which indicated that she could: cook, wash clothes, perform light housework, go to church, and go shopping.  (R. 245 - 252).

The second set of function reports were completed in November 2011, a few months after Plaintiff was released from the hospital. Plaintiff's husband stated "her activities are extremely limited since her kidney removal, I assist her with most everything required to make it through each day." (R. 263). He further stated that he assists her with all listed personal care activities (R. 264), and she cannot remember simple things like when to take her medication or how to follow cooking instructions. (R. 265). Plaintiff also no longer performed household chores because "due to her physical inabilities," she could no longer drive, needed "help getting around," no longer handled money or walked, and had been using a walker since she was released from the hospital in August 2011. (R. 265). Plaintiff's function report states very similar levels of activities because she "doesn't get around as good as [she] used to before [her] hospital stay." (R. 276). She stated that her husband helped her with almost every aspect of her life due to physical limitations, mental limitations, inability to remember, and an inability to cope with even basic activities of daily living. (R. 276 – 283).

The next time Plaintiff presented subjective claims about her abilities was at the administrative hearing held in May 2013. (R. 60). Plaintiff alleged that her most severe problems

coincided with the development of her kidney problems. She stated that she was no longer able to take care of herself physically, which exacerbated her pre-existing mental illnesses to the point that she cannot get out of bed on occasion. (R. 72). When she is mentally capable of executing a desire to leave bed, she sometimes experiences pain to the point that she is physically incapable of doing so. Two to three days a week Plaintiff either cannot get out of bed or has extreme difficulty doing so. (R. 75). When asked if Plaintiff could work five days a week, Plaintiff stated no, "I have a hard time trying to just be me five times – five days a week you know." (R. 79). Plaintiff stated that she attempts to perform household work but cannot complete the task due to discomfort, pain, and mental anguish. (R. 73). She finds temporary relief by sitting, but cannot sustain a sitting position for longer than 20 minutes. (R. 74).

As Plaintiff points out, the ALJ treated the difference between Plaintiff's alleged level of activity in April 2011 and her allegations following her hospital stay by stating:

> I am cognizant of the *dramatic* distinction between both the claimant's and her husband's in their first Function Reports – completed in April 2011 incident to initial denial of the current disability application – versus the subsequent iterations submitted just 7 months later at the reconsiderations stage.

> To be unequivocally clear, I have given dispositive weight to the prior reports because – as discussed in detail under paragraph 5, infra – there is no correspondent evidence in the objective record to justify the alleged and profound ensuring functional decline.

> Consequently, both the claimant's and her husband's answers in their second Function Reports appear to represent strategically exaggerated allegations made to increase the likelihood of approval following early denial of the current disability application.

(R. 47) (internal citations omitted). This language appears word-for-word two additional times in the ALJ's decision (R. 49, 52), and is not based on substantial evidence. A significant medical event intervened between Plaintiff's function reports.

*b.   Records Not Considered*

It is well established that an ALJ has a "basic obligation to develop a full and fair record" even when a claimant is represented by counsel. *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (internal citations omitted). This duty includes the duty to scrupulously probe all relevant facts and ensure that favorable as well as unfavorable facts are elicited. *Id.* (internal citations omitted). This duty also requires the ALJ to state what weight is given to the various pieces of evidence so that the reviewing court may understand why the ALJ reached a decision and determine if it is supported by substantial evidence. *Id.* An ALJ is not required to discuss every piece of evidence in the record, but must consider the evidence as a whole. *Henry v. Commissioner of Social Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) (citing *Spencer ex rel. Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir. 1985).

As mentioned above, Plaintiff suffered a series of complications and medical incidents which resulted in a six week hospital stay including two stays in the ICU, surgical removal of a major organ, multiple intubations culminating in a tracheotomy, pervasive and life threatening infection, as well as the placement of a feeding tube. These events took place in between Plaintiff's initial April self-reported evaluation of her functional abilities and the subsequent self-reports in November 2011 and at the 2013 administrative hearing. Following Plaintiff's hospital stay she immediately reported a change in her symptoms, in that she began reporting weakness, fatigue, loss of appetite, and memory loss as well as increased levels of anxiety and depression. (R. 531, 534).

The ALJ did not discuss Plaintiff's 2011 hospital stay or cite to any record associated with that stay. The Commissioner nonetheless asserts that the ALJ explicitly assessed Plaintiff's 2011 hospitalization and treatment because the ALJ inquired about it at the hearing and

determined that Plaintiff's "status post left nephrectomy" constituted a severe impairment. (Doc. 15, p. 12). Although the ALJ's decision states that Plaintiff's "status post left nephrectomy" was a severe impairment, it does not discuss that impairment at all, does not consider the context of the kidney removal, cites to no medical record regarding the kidney removal, does not note the various diagnoses made during the timeframe, and does not note the life-threatening complications associated with Plaintiff's kidney removal. The record shows that the ALJ may have considered Plaintiff's kidney removal fleetingly but does not provide any indication that the ALJ considered the extensive documentation of complications and illnesses associated with the kidney removal.

The medical evidence developed during the hospital stay included multiple indications of disease. For example, a bronchoscopy revealed obstructive lung disease with collapsed airways and left diaphragmatic dysfunction. (R. 404). A CT scan revealed "diffuse anasarca with edema within the subcutaneous adipose layers," small bilateral pleural effusions with compressive atelectasis, and calcification of her coronary arties. (R. 406). Another CT scan revealed masses on her lungs with unknown significance, splenomegaly, hepatomegaly possibly due to chronic liver disease, portal venous hypertension, adenopathy, atherosclerotic changes in her heart, and anthric changes in her lumbar spine. (R. 408, 414, 416, 419). Plaintiff was further found to have "persistent cardiac enlargement and pulmonary vascular congestion and partial bowel obstruction." (R. 420).

Plaintiff suffered a catastrophic failure to thrive while in the hospital and many of the above diseases may individually or in combination plausibly limit her ability to recover. This evidence should have been considered, and the ALJ's finding of "status post left nephrectomy," in no way makes it clear that the above diseases were considered. The ALJ's treatment of the

medical record related to Plaintiff's six week hospital stay is so lacking that it is unclear whether the ALJ simply ignored this evidence or chose to assign it no significance. Without an explanation sufficient to allow this court to follow the ALJ's reasoning, the decision cannot be based on substantial evidence.

### c. The ALJ's Treatment of the Record

The Commissioner argues that the medical record following Plaintiff's kidney removal is "grossly inconsistent" with Plaintiff's allegations in her November 2011 function report regardless of the ALJ's treatment of Plaintiff's hospital stay. The ALJ determined that the medical record following Plaintiff's release consisted primarily of sporadic emergency room visits, notes from sporadic mental health treatment, and notes from a few visits with Plaintiff's Primary Care Physician. The emergency room records document primarily "minor" complaints of high blood sugar and unremarkable physical exams, routine observations from doctors that Plaintiff was not in acute distress and was functioning normally as well as mental health evaluations that routinely found Plaintiff to be cooperative, coherent, average, and unremarkable. (R. 50). According to the ALJ, the objective medical evidence reveals a conservative course of treatment for both Plaintiff's mental condition and her physical conditions that belie her subjective claims.

The ALJ distilled the physical evidence by stating Plaintiff was never found to be in acute distress and was routinely found to have regular heart rate and rhythm, "clear lungs and unlabored breathing; normal unassisted gait; lack of cyanosis, swelling, crepitus, or deformity; and undiminished strength, reflexes, sensorium, distal pulses, and neuromotor skills."[2] (R. 50). The ALJ summed up the mental health evidence by stating the record reflects highly sporadic

---

[2] The ALJ also determined that Plaintiff's lab results were normal, but she had low levels of platelets, sodium, and chloride in September 2012. (R. 597). Plaintiff had increased levels of microalbumin, glucose, ALT, creatinine, GGT, and platelets in November 2012 and February 2013.  (R. 694-95).

treatment without required "psychiatric hospitalization, emergent care, crisis intervention, aggressive medication management, or even progressive outpatient therapy." *Id*. Both of these summations, however, misunderstand the nature of Plaintiff's claim and highlight the impact of the ALJ's failure to consider the whole medical record. Plaintiff's claim is not that she suffered prolonged physiological deformity or distress at the surgery site, or that she suffers from acute physical and mental distress.[3] Instead, Plaintiff asserts that she suffered a functional and mental decline following her hospital stay[4] and "nearly fatal series of illnesses and medication complications" including urosepsis, hydronephrosis, uriny tract obstruction, failure of stent placement, left nephrectomy, sepsis, and malnutrition "complicated by her background diagnoses of cirrhosis, ascites, hepatitis C, [] IV drug use," and uncontrolled diabetes and hypertension. Plaintiff's diseases are chronic rather than acute.

Following her release from the hospital, Plaintiff used the E.R. as her primary care physician and was apparently able to receive some level of care at community health clinics for a reduced fee. The level of care provided through these services was significantly limited, and as the ALJ noted, they were targeted to refills, follow ups, and maintenance of blood pressure and diabetes. At Primary Care, Plaintiff could not even receive a prescription for narcotic pain killers. Despite the limitations, the ALJ relied on the generic phrases found on medical forms from the clinics to discredit Plaintiff's subjective allegations.

Each time Plaintiff went to Primary Care, a "General Examination" was performed. By all accounts the forms contain pre-populated responses to the form questions always found under

---

[3] The ALJ explicitly that Plaintiff was claiming acute symptoms. (R. 49).
[4] When asked why Plaintiff feels she cannot work, she replied "because from day-to-day, I don't know how I'm going to feel. I don't - - I mean not being able to get up sometimes. I just - - I don't feel like I can just devote me, all of me to - - you know I just - - I don't know you know. I don't feel like I used to you know, and I've always worked you know, but I just don't feel like I used to." (R. 78). She went on to state "I mean I know that with what I've done before in the past I just know that physically I can't do those things. You know housekeeping. You know the vacuum cleaning motion." (R. 79).

the "General Examination" heading. Moreover, such exams are neither comprehensive nor designed to test Plaintiff physically; they are a routine generalized assessment in the context of a brief follow up visit at a reduced fee community clinic or doctor's office.  In this context, it is not at all clear that a generalized finding of "no wheezes/rhonchi/rales" reaches to Plaintiff's prior diagnosis of obstructive lung disease or that a generalized neurological finding of "normal sensation and strength" reaches to the kind of fatigue and weakness which may result from chronic illnesses such as cirrhosis, depression, kidney disease, COPD, pulmonary vascular congestion, or suffering a period of inability to sustain one's own life when considered individually or in combination. Even if this kind of generalized exam is designed to or is capable of finding these chronic illnesses, and every indication suggests that they are not, the doctors at Primary Care failed to diagnose Plaintiff with several diseases which were established in 2011. The only non-routine tests Plaintiff received, even when needed, were ordered because she sought care at the emergency room.

Whatever scope and purpose the general examination may have had, the medical record from 2012 and 2013 showed that Plaintiff consistently reported fatigue, weakness, depression, and anxiety. (R. 13, 531, 534, 674, 677, 679, 683, 682). Plaintiff was diagnosed with cirrhosis in February 2012, retinopathy[5] in August 2012, hypokalemia in November 2012, reported severe hair loss in 2011, and suffers from untreated GERD. (R. 682, 685, 693). Plaintiff was assessed at River Edge Behavior Health variously with restlessness, pressured speech, depressed mood, bland mood, anxious mood, and a flat affect. (R. 649, 656, 666, 707). In September 2013, Plaintiff was considered to have "debilitating effects" resulting from her mental health symptoms. (R. 701).  There is no indication that the ALJ considered any of this evidence incident to his finding that no relevant medical event exists which may explain Plaintiff's decline.

---

[5] The ALJ stated that there was no "record of complaint or care for alleged visual problems."

d. *Plaintiff's Level of Access*

Although the ALJ's decision cannot be based on substantial evidence because the ALJ failed to consider critical aspects of the record, the ALJ also erred in his discussion of the record considered. With regard to the negative inference the ALJ drew from Plaintiff's "conservative course of treatment," substantial evidence does not support a finding that Plaintiff received a conservative course of treatment because she had conservative disease. The objective medical record in this case documents a continued and sustained struggle with regard to Plaintiff paying for and obtaining the care she needs. The record clearly documents that Plaintiff was living in a homeless shelter in 2011. (R. 389). Plaintiff also routinely reported not being able to afford her medications. (R. 649, 665, 672). As she explained to River's Edge, she has no income or money to get medications and is waiting on disability. (R. 672).

The ALJ discredited these claims because in 2013 Plaintiff and her husband were apparently spending over 200 dollars a month on alcohol and cigarettes and she received insulin for free[6] while Plaintiff simultaneously alleged that she had not had medication in over a month due to lack of money.[7] (R 698). Using this statement to summarily discredit Plaintiff, despite clear evidence that Plaintiff was homeless in 2011 and had limited funds to purchase her medications, the ALJ did not develop the record regarding Plaintiff's ability to access more rigorous courses of treatment, whether more rigorous courses of treatment had been recommended by Plaintiff's doctors[8], whether $200 a month is sufficient for Plaintiff to have meaningful access to medical care, and what resources Plaintiff had access to in 2011 and 2012. Plaintiff appears to have been far more financially stable in 2013 than in 2011 and 2012.

---

[6] Plaintiff states that she cannot afford a blood glucose machine so she does not know how much insulin to take. (R. 78).

[7] The ALJ stated during the administrative hearing "It sounds like you've got some pretty scary medical conditions that you need to do something about, but really can't afford to do something about it." (R. 77).

[8] Plaintiff was diagnosed with retinopathy and referred to a specialist in August 2012. (R. 677). The ALJ did not mention Plaintiff's retinopathy.

Since the record does not contain substantial evidence concerning Plaintiff's optimal or preferred course of treatment,[9] and the record suggests that she lacked meaningful medical access, the ALJ erred in determining Plaintiff's conservative course of treatment discredited her allegations. See *Henry v. Commissioner of Social Sec.*, 802 F.3d 1264, 1268 (11th Cir. 2015) (finding error where ALJ drew negative inference from claimant's conservative course of treatment where Plaintiff stated he could not afford continued treatment and ALJ failed to develop the record). On the facts of this case it was particularly important to develop these aspects of the record because the evidence suggests Plaintiff has several major diseases that are not being treated, Plaintiff lacks meaningful medical access, and the record is particularly sparse regarding anything but routine maintenance of simple disease at the emergency room and community clinics—locations where Plaintiff may receive treatment without insurance or significant upfront payments. The record currently does not support the ALJ's negative inference any more than it supports an inference that Plaintiff's lack of access is contributing to or exacerbating a disability.

The ALJ's failure to properly develop and consider evidence of Plaintiff's lack of access resulted in several unsupported findings in this case.  For example, the ALJ found that the absence of "evidence of recent or significant corresponding testing" suggested that Plaintiff's allegations concerning several diseases were "posturing." (R. 46). These same diseases were diagnosed through testing in 2011. The ALJ only briefly mentioned Plaintiff's anxiety and depression, but found her bipolar disorder to be severe. Plaintiff's treatment records and subjective complaints focus almost exclusively on depression and anxiety. As one of the state agency reviewers stated in March 2012 following Plaintiff's psychological evaluation diagnosing

---

[9] The record contains ample evidence that Plaintiff suffers from multiple ongoing, untreated illnesses.

her with "severe dysthymic disorder," "claimant's allegation of depression is credible and consistent with clinical data." (R. 565).

The ALJ found that Plaintiff's allegations of blurred vision were unfounded, but Plaintiff was provisionally diagnosed with retinopathy following an eye exam and referred to a specialist.[10] (R. 677). The ALJ found that Plaintiff was treated with conservative drugs like "Desyrel, Wellbutrin, and Topamax." In fact Plaintiff was prescribed Prozac, Elavil, Bsaphris, Seqaquel and multiple other mediations, all of which were discontinued for reasons other than the severity of Plaintiff's symptoms. The ALJ found that the record lacked supporting evidence of cirrhosis, but Plaintiff suffered from ascites in 2011, tests showed the possibility of liver disease in 2011, and Primary Care made an independent diagnosis of cirrhosis. (R. 688). These discrepancies further separate the ALJ's decision from substantial evidence. The ALJ also found that representative examples of Plaintiff's blood pressure were 125/79, 138/88, and 140/100, but Plaintiff's blood pressure was close to or over 160/100 on many occasions throughout the record (R. 318, 339, 345, 467, 514, 521, 553, 595, 637, 672, 674) and was almost always over 140/80. (R. 336, 344, 365, 378, 518, 525, 590, 406, 634, 645, 687, 692, 718).

Finally, the ALJ also failed to develop the record or discuss the impact and limitations Plaintiff's past substance abuse placed on her treatment. There is a lengthy discussion in the record of the difficulties posed in prescribing habit forming medications to Plaintiff as well as the limitations her various diseases impose on her ability to take medications. (R. 388 – 389[11]). These limitations should have been developed and considered by the ALJ.

In the absence of substantial evidence supporting the determination that Plaintiff's claims constituted "strategically exaggerated allegations," the ALJ's decision is legally and procedurally

---

[10] At the administrative hearing, Plaintiff claimed that she "woke up one morning[] and [] could not see at all out of [her] right eye. (R. 77).
[11] Dr. Graves at Primary Care also opined that her Blood Pressure runs high due to Seroquel. (R. 680).

flawed. The ALJ's decision was based on a selective consideration of part of the evidence. Respondent's argument that substantial evidence supports the decision because the medical record in 2012 and 2013 is inconsistent with disability is without merit. The portions of the medical record the ALJ did not consider form a significant basis of Plaintiff's disability claim. This portion of the record contained several significant complications and indications of disease. Each disease is relevant individually. They are also relevant when considering Plaintiff's ability to make a substantial recovery from the 2011 period in which she could neither eat nor breathe independently.

Furthermore, it is not clear that the evidence the ALJ did consider would be inconsistent with disability if considered in combination with the rest of the medical record.  First, because the ALJ considered these records in isolation, they lack context. Plaintiff's medical record following her six week hospital stay must be anchored to the medical record developed during that stay where appropriate. Second, a critical finding in this case centers on the impact Plaintiff's lack of access has on her treatment options. The ALJ failed to properly develop the record with regard to Plaintiff's medical access or Plaintiff's recommended or optimal course of treatment. The record clearly indicates that Plaintiff cannot afford medical treatment and that further medical treatment has been recommended to Plaintiff. This needs to be developed rather than summarily denied simply because Plaintiff's husband spent money on non-essential items in 2013.

Absent any discussion whatsoever of significant portions of the medical evidence in this case, it is impossible to determine if the ALJ's decision was supported by substantial evidence or not. It is not clear if the ALJ determined that (1) Plaintiff's medical complications were incapable of resulting in reduction in her activities (2) Plaintiff's medical complications were

capable of resulting in the alleged symptoms, but not the degree alleged, or (3) the ALJ simply did not consider substantial portions of the medical evidence in this case. Accordingly, the ALJ's decision is not supported by substantial evidence.

## CONCLUSION

After a careful review of the record, it is **RECOMMENDED** that the Commissioner's decision be **REMANDED** pursuant to "sentence four." Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, <u>WITHIN FOURTEEN (14) DAYS</u> after being served with a copy thereof. The District Judge shall make a de novo determination of those portions of the Recommendation to which objection is made. All other portions of the Recommendation may be reviewed for clear error.

The parties are further notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

**SO RECOMMENDED**, this 22nd day of March, 2016.

s/ Charles H. Weigle_____
Charles H. Weigle
United States Magistrate Judge